|  |  |  |
|---|---|---|
| **JAMES E. GREEN and DEBRA F. GREEN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 3:05CV79-C** |
| | ) | |
| **KPMG, LLP, WACHOVIA BANK, NA.,** | ) | |
| **successor by merger to FIRST UNION** | ) | |
| **NATIONAL BANK, N.A., QA INVESTMENTS,** | ) | |
| **LLP, and QUELLOS GROUP, PPC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |


|  |  |  |
|---|---|---|
| **ROBERT D. GREEN and PAMELA W.** | ) | |
| **GREEN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 3:05CV80-C** |
| | ) | |
| **KPMG, LLP, WACHOVIA BANK, N.A. ,** | ) | |
| **successor by merger to FIRST UNION** | ) | |
| **NATIONAL BANK, N.A., QA INVESTMENTS,** | ) | |
| **LLC and QUELLOS GROUP, LLP** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

STEPHEN R. PUCKETT, BETH W. PUCKETT,)
and P IV LIMITED  PARTNERSHIP, )
                                    )

        **Plaintiffs,**           )

        **vs.**                     )          **Civil No. 3:05CV87-C**

KPMG, LLP; WILLIAM L. SPITZ; )
WACHOVIA BANK, N.A., successor by merger )
to FIRST UNION NATIONAL BANK, N.A.; )
QA INVESTMENTS, LLC; and QUELLOS )
GROUPS, LLC, )
                                    )

        **Defendants.**        )

---

CHARLES A. PATTON, individually and as )
Trustee and as Trustee of the CAP Children's )
Irrevocable Trust and as custodian of )
LINDSEY V. PATTON and REBECCA A. )
PATTON; BARBARA J. PATTON; WILLIAM )
A. PATTON; PATTON  ASSOCIATES, LP; )
LBC INVESTMENTS LLC; and LINDA G. )
WATKINS; )
                                    )

        **Plaintiffs,**           )

        **vs.**                     )          **Civil No. 3:05CV88-C**

FIRST UNION NATIONAL BANK, N.A. a/k/a )
WACHOVIA BANK, N.A.; KPMG LLP; QA )
INVESTMENTS, LLC; QUELLOS GROUP, )
LLC; QUELLOS CAPITAL MANAGEMENT, )
LP; QUADRA ADVISORS, LLC; QUADRA )
ASSOCIATES, LLC a/k/a QUELLOS )
FINANCIAL  ADVISORS, LLC; RALPH E. )
LOVEJOY, II; PILLSBURY WINTHROP LLP )
f/k/a PILLSBURY MADISON & SUTRO, LLP; )
and  PRICEWATERHOUSECOOPERS, LLP; )
                                    )

        **Defendants.**        )

# MEMORANDUM AND RECOMMENDATION AND ORDER

**THIS MATTER** is before the Court on the "Motion[s] to Remand" filed by the Plaintiffs in each of the above-captioned cases (Civil No. 3:05CV79-C, document #17, Civil No. 3:05CV80-C, document #17, Civil No. 3:05CV87-C, document #20, and Civil No. 3:05CV88-C, document #41); and the parties' associated briefs and exhibits.

On December 2, 2005, the Plaintiffs filed a joint "Motion to Consolidate" these cases for the limited purpose of the Court's consideration of their Motions to Remand, which has also been fully briefed.[1]

These matters were referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these Motions are ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will grant the Plaintiffs' "Motion to Consolidate," and will respectfully recommend that their respective "Motions to Remand" be granted, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

These cases share nearly identical, undisputed jurisdictional facts. Although some of the Defendants are citizens of other states, the Plaintiffs and Defendant Wachovia Bank, N.A., as successor in interest to First Union National Bank, N.A. (Wachovia"), are all citizens of North Carolina. In each case, on advice from Defendants Wachovia, KPMG, LLP, Q.A. Investments, LLC., and Quellos Group, LLC (the latter two Defendants identified collectively throughout as

---

[1]Although the Motion to Consolidate bears the captions of the four cases referenced above, the Clerk of Court docketed it only in Civil No.3:05CV87-C, as document #37. However, the parties understood that the Motion was intended to be filed in all of the cases and briefed it accordingly.

"Quellos"), as well as the other Defendants which are named in some but not all of the Complaints, the Plaintiffs invested in a "Foreign Leveraged Investment Program" ("FLIP").

It is undisputed that the FLIPs were marketed by KPMG through Wachovia, Quellos, and the other Defendants as "tax shelters" that would reduce the tax liability of individuals and entities such as the Plaintiffs that they otherwise would have incurred on capital gains generated by sales of family-owned or other closely-held businesses. The Plaintiffs allege that at the times they entered into their respective FLIPs, however, the Defendants were aware that the Internal Revenue Service ("IRS") had not approved the tax losses allegedly generated, but that they advised the Plaintiffs that the FLIPs were allowable tax shelters under the then-current tax code.

At the heart of the Plaintiffs' claims, as well as the federal criminal prosecutions discussed below, is the allegation that prior to selling the FLIPs to the Plaintiffs, as well as to numerous other individuals, KPMG had concluded that the FLIP was not a legitimate tax shelter. The Plaintiff's allege that internal documents establish that KPMG had concluded, instead, that the FLIP was "dubious," a "gambit," and a "tax disaster."

The apparent structure of the FLIP was virtually the same in each case. Sometime in 1997 or 1998,[2] as arranged by KPMG, a sum in excess of $600,000 was wired from the Plaintiffs' respective Wachovia accounts to nonparty BankAmerican International, a federally chartered bank located in New York, which in turn wired the funds to an entity in the Cayman Islands,[3] allegedly in exchange for a "warrant," that is, an option to purchase stock in the United Bank of Switzerland

---

[2]Concerning the Green Plaintiffs, the disputed transactions occurred in 1997, and for the Puckett and Patton Plaintiffs, in 1998.

[3]In these cases, the "Cayman Islands entities" were Ponderosa Capital, Inc., Lexington Capital, Inc., Glendale Capital, Inc., and Gleneagle Capital, Inc.

("UBS"). Each warrant contained an arbitration clause providing that disputes "relating to" the warrant would be resolved by binding arbitration.

The Defendants advised the Plaintiffs that as a result of the FLIPs, each would acquire a cost basis in the UBS stock far greater than their cash outlays that they could then use to "shelter" their other capital gains on their tax returns. In each case, KPMG also prepared the subject tax returns for the Plaintiffs.

On July 26, 2001, the IRS issued "Notice 2001-45," disallowing the tax losses the Plaintiffs expected to be generated by the FLIPs. The IRS subsequently audited the Plaintiffs' tax returns, and the Plaintiffs were required to pay additional 1997 (Greens) or 1998 (Pucketts and Pattons) income taxes, as well as interest and penalties. It is undisputed that the Plaintiffs cooperated with the IRS in its subsequent investigation of KPMG's practices.

Between June 4 and July 7, 2004, each set of Plaintiffs filed a Complaint in the Superior Court of Mecklenburg County, alleging state law claims for fraud, breach of fiduciary duty, intentional and negligent misrepresentation, unfair and deceptive trade practices, and civil conspiracy, in which they sought to recover the funds they then believed had been invested in the FLIPs, fees they had paid to the Defendants, as well as other compensatory and punitive damages.

Between February 22 and 25, 2005, the Defendants removed each state case to federal court, alleging two grounds for federal subject matter jurisdiction: (1) that the purchase of the warrant in each FLIP was an "international banking transaction" supporting federal jurisdiction under the Edge Act, 12 U.S.C. § 632, and (2) because the warrants contained an arbitration clause, removal was proper under the Convention for the Recognition and Enforcement of Foreign Arbitral Awards, 9

U.S.C. § 201, et. seq. ("the Convention").[4]

The Defendants also filed Motions (seventeen in all, listed in Section III below) seeking either to dismiss the respective cases on the merits or to compel arbitration and stay further proceedings pending arbitration.

The Plaintiffs responded with the subject Motions to Remand, contending initially that the Defendant's knowingly false tax advice, rather than the supposed purchase of the warrants in the Cayman Islands entities, was the basis for their claims, and consequently, that the warrants did not provide a jurisdictional basis under either the Edge Act or the Convention.

Following an initial round of briefing on the pending Motions, however, events occurred that, as the Plaintiffs point out in recent filings, have clarified and narrowed the jurisdictional issues.

On August 26, 2005, KPMG and the United States Department of Justice ("USDOJ") entered into a Deferred Prosecution Agreement ("DPA") arising entirely from KPMG's FLIP program. In the DPA, KPMG consented to the filing in the United States District Court for the Southern District of New York of a one-count criminal information charging it with participating in a conspiracy in violation of 18 U.S.C. § 371 to defraud the United States and the IRS of "income taxes on billions of dollars of capital gains," committing tax evasion in violation of 26 U.S.C. § 7201, and making and subscribing false and fraudulent tax returns in violation of 26 U.S.C. § 7206. See DPA at 1-6, Exhibit A to "Plaintiffs' Joint Supplemental Response to Defendants' Notice of Removal ..." (document #26 in Civil No. 3:05CV87-C). KPMG agreed, among other things, to pay the United States $456 million in fines, restitution, and disgorgement of fees, to cease its private tax

---

[4]The parties agree for the purposes of these Motions that if federal jurisdiction otherwise exists under either the Edge Act or the Convention, that removal may be made "at any time," and, accordingly, the timeliness of removal is not at issue.

practice, and to cooperate in the USDOJ's prosecution of its members, partners, and employees who

had participated in the conspiracy.  Id.

In the DPA, KPMG also stipulated to a "Statement of Facts" ("SOF"), the truth of which it

is prohibited from denying.[5]   Regarding the alleged bases for federal subject matter jurisdiction that

it had earlier raised in these cases, KPMG admitted that "certain money was paid [by KMPG's

clients] as part of an investment (i.e., for a warrant), when in truth and in fact the money constituted

fees due to promoters and other facilitators of the transaction."  DPA Statement of Facts, ¶ 9.

KPMG went on to admit that it had:

> falsely claimed that one of the participants in the transaction (an owner of the
> Cayman Islands entity) was a foreign person unrelated to the other participants, when
> in truth and in fact this foreign person was simply a nominee who received a fee to
> assist KPMG ... in generating the phony tax losses.

DPA Statement of Facts, ¶ 19(d).

Likewise, ¶ 19(e) of the SOF makes clear that KPMG and its co-conspirators:

> falsely stated that money was paid by the FLIP ... clients for an "investment"
> component of the transactions (a warrant or swap), when in truth and in fact that
> money constituted fees paid to KPMG, the Law Firm, the bank participant, the
> nominee foreign person, and other participants, as well as money that was
> temporarily parked in the deal but ultimately returned to the client.

In ¶ 10 of the SOF,  KPMG admitted that prior to their scheme being uncovered, senior

KPMG tax professionals had:

> specifically questioned ... whether the non-resident alien, whose participation as an
> equity holder of the foreign corporation was critical to the expected tax treatment of
> the redemption, would be respected by the IRS as a true equity holder or would
> instead be treated as a service provider or a debt holder being paid a fee to

---

[5]Paragraph 15 of the DPA provides that "KPMG agrees that it shall not, through its attorneys, agents,
partners, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its
representations in this agreement."

accommodate the investor.

On September 8, 2005, the Plaintiffs filed their above-referenced "Joint Supplemental Response to Defendants' Notice of Removal," presenting a summary of the USDOJ prosecution and the DPA. The Defendants subsequently filed briefs in response to this pleading.

In October 2005, the USDOJ indicted 17 former KPMG executives, including KPMG's associate general counsel, and others associated with the FLIP strategy.

On December 2, 2005, the Plaintiffs filed their more detailed "Joint Summary of Facts Relating to KPMG's Deferred Prosecution Agreement and Admissions," in response to which the Defendants filed another round of briefs.

The same day, the Plaintiffs also filed a joint "Motion to Consolidate" these cases for the limited purpose of the Court's consideration of their Motions to Remand, which has been fully briefed and will be granted.

The Plaintiffs' Motions to Remand have also been fully briefed and are, therefore, now ripe for disposition.

## II. DISCUSSION OF CLAIMS

### A. Federal Subject Matter Jurisdiction under the Edge Act

The existence of subject matter jurisdiction is a threshold issue, and any removed case lacking a proper basis for subject matter jurisdiction must be remanded to state court. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 96 (1998). See also Jones v. American Postal Workers Union, 192 F.3d 417, 422 (4th Cir. 1999); and Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). In this regard, it is well established that "[t]he subject matter jurisdiction of federal courts

is limited and the federal courts may exercise only that jurisdiction which Congress has prescribed."

Chris v. Tenet, 221 F.3d 648, 655 (4th Cir. 2000), citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Accord Darcangelo v. Verizon Communications, Inc., 292 F.3d 181, 186 (4th Cir. 2002) ("In general, an action filed in state court may be removed to federal court only if it might have been brought in federal court originally"). The requirements are so absolute that "[n]o party need assert [a lack of subject matter jurisdiction]. No party can waive the defect, or consent to jurisdiction. No court can ignore the defect; rather a court, noticing the defect, must raise the matter on its own." Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 389 (1998) (internal citations omitted). Accord Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982).

The party asserting federal jurisdiction has the burden generally to establish that subject matter jurisdiction exists. See, e.g., Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999); Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991); and Norfolk Southern Ry. Co. v. Energy Development Corp., 312 F.Supp.2d 833, 835 (S.D.W.Va. 2004). In this case, there is no dispute that the citizenship of the parties is not completely diverse and, therefore, that the basis for federal subject matter jurisdiction, if any, must arise under what is commonly called "federal question" jurisdiction.

As the Fourth Circuit recently stated:

Title 28 U.S.C. § 1331 provides that district courts have subject matter jurisdiction of every civil action that "arises under the Constitution, laws, or treaties of the United States." This means that Congress has given the lower federal courts jurisdiction to hear only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.

Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 606-07 (4th Cir. 2002) (emphasis added).

Although the Plaintiffs' claims are based entirely on state law, the Edge Act, 12 U.S.C. § 632, provides that "all suits of a civil nature ... to which any [federally-chartered bank] ... shall be a party, arising out of ... international or foreign banking ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits." Accord Bank of America Corp. v. Lemgruber, 385 F. Supp.2d 200, 207, fn. 5 (S.D.N.Y. 2005) (Edge Act designed to protect national banks engaging in transactions involving international banking or international financial operations by providing federal forum for suits arising out of such transactions).

As the parties agree for these purposes, the only arguable international transaction in the FLIPs was the alleged purchase of warrants from the Cayman Islands entities. However, KMPG has now admitted in a judicial proceeding that the funds were wired to the Cayman Islands not as an investment designed to produce tax losses, but as an artifice to disguise that "in truth and in fact," the funds were being distributed to the Defendants as undisclosed fees. Indeed, KPMG admits that rather than actually selling the Plaintiffs an interest in anything, the Cayman Islands entities were proverbial "straw men" conspiring with KPMG whose only financial interest was a fee they received for their complicity in criminal conduct. The Defendants have not cited and the undersigned is unaware of any authority considering whether, much less holding that, such admittedly "false," "unlawful," and "fraudulent" activities satisfy the Edge Act's international banking transaction requirement, or otherwise are sufficient to defeat the aggrieved party's choice of forum in a resulting civil action. In the absence of such authority, the undersigned concludes that general principles of justice mandate that the Defendants may not claim federal subject matter jurisdiction through sham

10

transactions of their own making.

Moreover, even assuming arguendo that the purported purchase of the warrants amounted to an international banking transaction, courts considering the issue have held that federal jurisdiction arises under the Edge Act only when the federal bank engaged in the international transaction at issue and is a party to the lawsuit. See, e.g., Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 792-93 (2nd Cir. 1980) (action based on international letter of credit issued by defendant bank); Lemgruber, 385 F. Supp.2d at 207 (lawsuit arose from agreement between defendant bank and foreign plaintiff); In re Lloyd's American Trust Fund Litigation, 928 F. Supp. 333, 338-41 (S.D.N.Y. 1996) (same); and Travis v. National City Bank of New York, 23 F. Supp. 363, 365-66 (E.D.N.Y.1938) (same). Although Wachovia, and its predecessor in interest First Union, were federally-chartered banks, neither engaged in any international transactions related to these lawsuits. Rather, non-party BankAmerican International wired the Plaintiffs' funds to the Cayman Islands entities. Accordingly, even if the warrants were sufficient to otherwise support jurisdiction under the Edge Act, which they are not, these Defendants would not be able to assert it.

## B. Federal Subject Matter Jurisdiction under the Convention for the Recognition and Enforcement of Foreign Arbitral Awards

The Convention for the Recognition and Enforcement of Foreign Arbitral Awards provides that "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award ... [that is not] entirely between citizens of the United States," the action is removable to federal district court. 9 U.S.C. §§ 202, 205, and 206.

Although there is no binding authority on point, it is evident that for the same reasons the

Defendants may not rely on the fraudulent FLIP transactions to create federal jurisdiction under the Edge Act, they also are prohibited from doing so under the Convention. Indeed, the United States District Court for the District of New Jersey recently held that the arbitration clause in the sham warrants was insufficient to create federal subject matter jurisdiction under the Convention. See Sullivan, et. al. v. KPMG, LLP, et. al., Civil No. 3:05-CV-817-SRC-TJB (D. N.J.) (case remanded where only grounds for removal from state court was arbitration clause in Cayman Islands warrant). For the same reasons, the Defendants in this case may not rely on the arbitration clause contained in the warrants "purchased" in identical fashion by the Plaintiffs to create federal jurisdiction.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the Plaintiffs' "Motion[s] to Remand," docketed in Civil No. 3:05CV79-C as document #17, in Civil No. 3:05CV80-C as document #17, in Civil No. 3:05CV87-C as document #20, and in Civil No. 3:05CV88-C as document #41, be **GRANTED** and that these actions be **REMANDED** to the Superior Court of Mecklenburg County, North Carolina.

The undersigned further respectfully recommends that the Defendants' pending motions in these matters, listed below, be **DENIED WITHOUT PREJUDICE** to their right to re-file the Motions in state court, should they conclude that despite the recent factual admissions discussed above, those Motions are arguably meritorious. Those Motions are:

Civil No. 3:05CV79-C:

1. Defendant Wachovia's "Motion to Compel Arbitration and Stay Pending Arbitration" (document #8);

2. The Quellos Defendants' "Motion to Compel Arbitration" (document #10) and "Motion to Stay Pending Arbitration" (document #12); and

3. Defendant KPMG's "Motion to Dismiss, or in the Alternative, to Compel Arbitration and Stay Pending Arbitration" (document #14).

Civil No. 3:05CV80-C:

1. Defendant Wachovia's "Motion to Compel Arbitration and Stay Pending Arbitration" (document #8);

2. The Quellos Defendants' "Motion to Compel Arbitration" (document #10) and "Motion to Stay Pending Arbitration" (document #12); and

3. Defendant KPMG's "Motion to Dismiss, or in the Alternative, to Compel Arbitration and Stay Pending Arbitration" (document #14).

Civil No. 3:05CV87-C:

1. Defendant Wachovia's "Motion to Compel Arbitration and Stay Pending Arbitration" (document #9);

2. Defendant KPMG's "Motion to Dismiss, or in the Alternative, to Compel Arbitration and Stay Pending Arbitration" (document #12); and

3. The Quellos Defendants' "Motion to Compel Arbitration" (document #14) and "Motion to Stay Pending Arbitration" (document #16).

Civil No. 3:05CV88-C:

1. Defendant Pricewaterhouse's "Motion to Stay Pending Arbitration" (document #15);

2. Defendant Wachovia's "Motion to Compel Arbitration and Stay Pending Arbitration" (document #18);

3. Defendant Pillsbury Winthrop's "Motion to Compel Arbitration, Dismiss, and/or Stay" (document #23);

4. The Quellos Defendants' "Motion to Compel Arbitration and to Stay" (document #24); and

5. Defendant KPMG's "Motion to Dismiss, or in the Alternative, to Compel Arbitration and Stay Pending Arbitration" (document #14).

## IV. <u>ORDER</u>

**IT IS THEREFORE ORDERED**:

1. The Plaintiffs' joint "Motion to Consolidate" these cases for jurisdictional purposes only (document #37 in Civil No..3:05CV87-C) is **GRANTED**.

2. The Puckett Plaintiffs' "Motion to Amend and Supplement Complaint" (document #41 in Civil No. 3:05CV87-C) is **DENIED WITHOUT PREJUDICE** to the Plaintiffs' rights to amend their Complaint in state court.

3. All further proceedings in this action, including <u>all</u> discovery, are **STAYED** pending the District Court's ruling on this Memorandum and Recommendation and Order.

## V. <u>NOTICE OF APPEAL RIGHTS</u>

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>United States v. Rice</u>, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with

the district court constitutes a waiver of the right to <u>de novo</u> review by the district court.  <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005);  <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder</u>, 889 F.2d at 1365.   Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal.  <u>Diamond</u>, 416 F.3d at 316; <u>Wells</u>, 109 F.3d at 201; <u>Page</u>, 337 F.3d at 416 n.3; <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation and Order to counsel for the parties; <u>and to the Honorable Robert J. Conrad, Jr</u>.

   **SO RECOMMENDED AND ORDERED.**

Signed: February 27, 2006

_Carl Horn, III_
_____

Carl Horn, III
United States Magistrate Judge